UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>D2- DAVID BRILEY,<br><br>  Defendant. | Case No. 14-20525<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER DENYING DAVID BRILEY'S MOTION TO VACATE JUDGMENT UNDER 28 U.S.C. § 2255**

Four men from Philadelphia—Nathaniel Pembrook, David Briley, Shaheed Calhoun, and Orlando Johnson—traveled to Michigan where, on April 22, 2014, they attempted to rob Medawar Jewelers in Grand Rapids and then successfully robbed Tapper's Jewelry in West Bloomfield. A gun was used during both robberies. Following a jury trial, the men were convicted of Hobbs Act conspiracy, Hobbs Act robbery, and two counts of brandishing a firearm during and in relation to a crime of violence. One of the gun counts was subsequently vacated and all four men were resentenced. David Briley now seeks post-conviction relief, claiming his trial counsel was ineffective for failing to adequately pursue an alibi defense that would have put Briley in Philadelphia at the time of the robberies. As Briley's claim lacks merit, the motion is DENIED.

## I.

This case involved lengthy pretrial proceedings and a multi-week trial. In affirming the convictions, the Sixth Circuit provided an extensive summary of the evidence. The Court will repeat most of it here for helpful background and in aid of analyzing prejudice to Briley from the absence of an alibi defense:

> FBI Agent Brian Max began his investigation of two similar Michigan jewelry-store robberies—separated by a drive of five hours and 150 miles—with a "tower dump" for the cell-phone towers near the two stores. A "tower dump" is a chronological list of every phone number that used the tower for any purpose (voice call, text, internet connection, etc.) regardless of provider (e.g., Verizon, AT&T). Agent Max found that a phone number ending "1434"—assigned to a recently activated, prepaid cell phone with no name on the account—had used a tower or towers near each of the robberies at times corresponding to those robberies.
>
> Agent Max then obtained the "call detail records" (a list of all calls to and from that number, with dates, times, and tower locations) for the #1434–phone and tracked its path from Philadelphia (April 21, 2014) to Milwaukee; to New Buffalo, Michigan, for an overnight stay; to Plainfield Township, near the Medawar Jewelry store, 40 minutes before the first robbery (about 11:50 a.m.); to West Bloomfield Township, near the Tapper's Jewelry store, 15 minutes before the second robbery (5:00 p.m.); then back to Philadelphia the next day (April 23, 2014). Plainfield Township is less than two hours' drive north of New Buffalo; West Bloomfield Township, near Detroit, is less than three hours' drive from Plainfield Township.
>
> Agent Max discovered three more phone numbers (ending 0033, 7819, and 1574) that followed the same pattern. These four numbers had also contacted each other repeatedly during the trip, including, for example, dozens of times in the hour before the Medawar robbery. Of particular interest, a call from the #0033–phone to Enterprise car rental made a record of "Shaheed" Calhoun's renting a white Volkswagen Passat from a location at the Philadelphia train station on April 11 and returning it there on April 23 after driving it 3,463 miles. Calhoun had provided Enterprise his Pennsylvania driver's license and paid with his credit card.
>
> In addition to Agent Max's cell-tower and phone-records investigation, the FBI also had witness statements and surveillance videos from the

2

robberies. At 12:30 p.m. on April 22, 2014, four men rushed into the Medawar Jewelry store, one suspiciously carrying a large bag. Another had a hammer and began striking the glass jewelry cases (which did not break) while a third ordered an employee at gunpoint to open a safe. There were no customers in the store. The other employees, quickly recognizing the robbery, hid in the break room with the lights out, watching on closed-circuit video while the owner retrieved his own handguns. When the owner yelled for the robbers to leave because he was armed, one robber—armed with a handgun—instead pursued him. When that robber entered the break room, the owner shot at him, hitting him in the arm. At that, the robbers fled, one dripping blood from the gunshot wound. They were gone by the time police responded to the 911 call, but witnesses described a black, new model Chrysler Town & Country minivan. Police tracked blood drops to a location behind the store and exterior security videos had recorded the minivan parked there for an hour before the robbery with two of the robbers milling about nearby. No employee was injured in the robbery nor was anything of significant value stolen. The loss was $2,252 in damage to the store. None of the victims was able to identify any of the robbers, either immediately or later at trial.

At 5:15 p.m. that same day, three men wearing masks and gloves entered the Tapper's Jewelry store near Detroit, and ordered the employees and customers down on the ground. The first robber had a handgun and forced the security guard to the ground while the other two ordered an employee to open the case of Rolex watches. One robber held a bag while the other filled it with watches. This robbery lasted two minutes. An employee had tripped a silent alarm, but the robbers were gone before the police arrived. Exterior surveillance video, beginning an hour before the robbery, recorded the simultaneous arrival of the black Chrysler minivan and a white Volkswagen Passat. One man got out of the minivan; two exited the Passat. They separately went into a nearby shopping mall and returned without ever acknowledging each other, but upon their return, the man from the van got into the Passat and the two from the Passat got into the van. The first man moved the Passat to park it facing the Tapper's entrance. The van moved behind the store and three men wearing hoodies and gloves got out. Moments later, the same three ran back to the van with two bags and drove off. No one was injured during the robbery. The robbers made off with 123 Rolex watches, worth $853,957.8 None of the victims was able to identify any of the robbers, either immediately or later at trial.

Further investigation led to a security video from a Comfort Inn in New Buffalo on April 21, the day before the robberies, which had recorded the

3

simultaneous arrival of the Passat and the minivan at about 10:30 p.m. The driver of the Passat rented three rooms, the cars pulled around to park, and six men got out of the two cars and shared the three rooms. A few minutes after arriving, three men took the Passat and then the minivan across the street for gas at a Shell station, as recorded on the Shell station's surveillance video. The Comfort Inn video also recorded four men leaving the motel the next morning at about 9:00 a.m., and those men were recognizable in the jewelry stores' videos as the men in the hotel videos.

The cell-tower records had also placed the four suspected cell phones near this New Buffalo location and the call-detail records helped put names to three of the numbers: Calhoun to #0033 based on the aforementioned call to Enterprise as well as calls to his mother and girlfriend; Johnson to #1434 based on calls to his girlfriend (over 100 calls); and Briley to #7819 based on calls to his ex-wife, current girlfriend, daughter, and mother. The Shell station attendant, Sue Graff, later picked Calhoun and Briley from a police photo array. Johnson had given the #1434–phone to a friend in Philadelphia, who gave it to the FBI when questioned and who also identified Johnson in the videos from the Shell station and Tapper's.

Briley was most evident in the videos from both the hotel and Tapper's because of a distinctive outfit.

Meanwhile, the blood drops at Medawar Jewelry produced Pembrook's name from the DNA database. Police tracked him to a Philadelphia hospital at which he had arrived at 4:00 a.m. on April 23 for removal of the bullet from his arm. He left a day or so later, but had called Briley from the phone in his hospital room before leaving. Ballistic tests matched the removed bullet to the store owner's gun. Philadelphia police arrested Pembrook and sent him back to Detroit where he declined to cooperate and instead—using another inmate's phone passcode—called his girlfriend with a covert warning to the other robbers that the police were onto them.

Police eventually arrested the other three suspects and sent them to Detroit for prosecution. When the police arrested Calhoun, he had in his wallet the credit card and driver's license used to rent the Passat. When the police arrested Briley, his cell phone had a picture of him wearing the same outfit he was wearing in the Shell station surveillance video.

The jury convicted all four defendants on all counts and the district court sentenced each of the four to 33 years in prison—one year each for the robbery, conspiracy, and felon-in-possession counts, to run concurrently,

and 32 years for the two § 924(c) convictions (seven for the first and a mandatory 25 for the second, to run consecutively).

*United States v. Pembrook*, 876 F.3d 812, 816–19 (6th Cir. 2017), *judgment vacated on sentencing grounds*, *Briley v. United States*, 139 S. Ct. 65 (2018).

Following changes in the law, Hobbs Act conspiracy is no longer a crime of violence. *See United States v. Davis*, 139 S. Ct. 2319 (2019) (holding that § 924(c)(3)(B)'s residual clause is unconstitutionally vague). Thus, Defendants' convictions under 18 U.S.C. § 924(c) for having a gun during the Medawar robbery were vacated. (*See* ECF No. 233.) Briley was then resentenced to 169 months' imprisonment on the remaining counts of conviction. (ECF No. 290.)

## II.

On January 14, 2022, Briley filed a pro se motion under 18 U.S.C. § 2255 to vacate his judgment. (ECF No. 305.) He raised one issue: that his trial counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for failing to investigate and produce alibi witnesses and evidence that would have put Briley in Philadelphia on the day of the Michigan jewelry store robberies. (*Id.*) More specifically, Briley claimed he had dinner at Copa's Bar and Grill in Philadelphia with his friend James "Steve" Player and Player's then-fiancée, Sreeta Reddy, the night before Player went into the hospital. (*Id.* at PageID.4660.) The dinner, suggests Briley, had to have been on April 21, 2014, because there are hospital records showing that Player was admitted on April 22, 2014. (*Id.* at PageID.4684; ECF No. 329-1.) So he told his lawyer to get in touch with Player and Reddy. (ECF No. 305, PageID.4660.)

5

Briley believes his counsel waited too long to do so and was deficient for failing to investigate or call them as trial witnesses. (*Id*. at PageID.4660–4661.)

Briley claimed another "woeful act of neglect"—his counsel's failure to use at trial a day planner from his former employer, Jerri Brooks, which would have shown Briley was doing some renovation work at her home in Philadelphia during the time of the Michigan robberies. (*Id*. at PageID.4661–4662.)

The government opposed Briley's motion. (ECF No. 315.) The government provided notes and memos from Briley's trial counsel and the Philadelphia lawyer that counsel hired to investigate Briley's alibi defense. (*Id*.) These materials, argued the government, demonstrate that counsel was not ineffective. (*Id*.) For instance, the materials revealed that the investigator reviewed Brooks' day-planner in November 2015. (ECF No. 315-2.) This review made clear that Brooks had altered some dates and entries in 2014 to make it appear Briley was working in Philadelphia during the time of the robberies. (*Id*.) He advised Briley's trial counsel that Brooks created "an ex post facto journal written so as to appear to have been created contemporaneously." (ECF No. 315-2, PageID.4738.) (The materials also revealed that Brooks was the mother of one of Briley's good friends.) The investigator followed up with Brooks. She acknowledged that she had "re-created" and "transcribed" the journal the day she gave it to him to review. (*Id*.) In turn, he told her that using the journal would be worse than having no proof at all and he asked her to try to find something else to corroborate the dates of Briley's work on her home. (*Id*.) She told him "she would try but that it would be doubtful." (*Id*.)

6

The government also argued that, even if the Court found deficient performance in the handling of the alibi defense, Briley failed to demonstrate prejudice. (ECF No. 315, PageID.4732–4734.)

The Court appointed counsel for Briley and ordered an evidentiary hearing. (ECF No. 319.) The Court heard testimony from (1) William Swor—Briley's trial counsel, (2) Steven LaCheen—the Philadelphia lawyer hired by Swor to investigate the alibi defense, (3) Sreeta Reddy—Player's fiancée and Briley's proffered alibi witness, and (4) Keniysha Kirkland—Briley's daughter. (ECF No. 328.) Jerri Brooks—the creator of the day-planner—did not testify. The parties also submitted supplemental briefing after the hearing. (ECF Nos. 329, 330.)

### III.

A federal prisoner may challenge his sentence by way of a motion filed pursuant to 28 U.S.C. § 2255. To prevail, Briley must show that the sentence imposed is "in violation of the Constitution or laws of the United States," or "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496–97 (6th Cir. 2003)).

Briley's § 2255 motion only contends that the ineffective assistance of his trial counsel violated his Sixth Amendment right to a fair trial. This requires a showing

7

that: (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Deficient performance means his lawyer's representation fell below an objective standard of reasonableness. *Id.* at 694. Prejudice means there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

The Court will address each prong in turn.

### A.

Counsel has a duty to investigate defenses. *Wiggins v. Smith*, 539 U.S. 510, 527–28 (2003). "Counsel's failure to investigate a defense may constitute ineffective assistance . . . particularly when an attorney fails to investigate a plausible alibi defense." *Cope v. United States*, 385 F. App'x 531, 533 (6th Cir. 2010). "[I]n the context of asking whether counsel adequately investigated his client's defense, the ultimate inquiry is whether the choice not to conduct additional investigation was 'reasonable[] in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 691). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

8

1.

Briley's trial counsel, William Swor, credibly testified about his handling of the alibi defense.

Briley acknowledges that Swor is "a recognized, well regarded and experienced attorney who has practiced extensively in the Eastern District of Michigan." (ECF No. 329, PageID.4895.) Swor was retained to represent Briley in December of 2014. (ECF No. 328, PageID.4818.) Other lawyers worked on the case with him. Two of those lawyers, Yassaman Hajivalizadeh and Elizabeth Young, had an initial meeting with Briley on December 9, 2014 and prepared a summary for Swor. (ECF No. 328, Gov't Ex. 1.)

According to the summary, Briley raised an alibi. He told counsel he was in Philadelphia on April 21 and 22, 2014. (*Id.*) He told them he went to Copa's with his friend Steve Player and Player's fiancée, Sreeta Reddy. (*Id.*) He also recalled running into his daughter, Keniysha, that same evening. (*Id.*) He recounted that the next day, April 22, 2014, he got his hair cut (by co-defendant Nathanial Pembrook's uncle) and had dinner at his aunt's house (co-defendant Shaheed Calhoun's mother). (*Id.*) He did not mention a hospital visit to see Player. (*Id.*)

Swor was "concerned" about the alibi defense. (ECF No. 328, PageID.4822.) He thought the dates and times being provided eight months after the incident appeared "too perfect" and "too precise." (*Id.*) These were "caution signs." (*Id.*) But it was foundation for further inquiry. (*Id.*)

9

During the representation, Swor met with Briley's daughter (Keniysha), to discuss her father's case. Swor did not recall her mentioning that she ran into her father on the night of April 21, 2014. (*Id.* at PageID.4823.) Keniysha likewise testified that she was "unsure" if she told Swor that she ran into her father that evening. (*Id.* at PageID.4824–4825.) Most significant, in August 2015, Swor retained another experienced criminal defense lawyer from Philadelphia, Steve LaCheen, to investigate the alibi defense and interview potential alibi witnesses. (*Id.* at PageID.4825–4826, 4866.) Swor prepared a factual summary for LaCheen titled "Background Information and Questions for alibi witnesses" that he believed was sent no later than October 29, 2015. (ECF No. 328, Gov't Ex. 2.) The summary identified Player, Reddy, and Brooks. (*Id.*) It detailed Briley's claim that Player was admitted to the hospital, that Briley was with Reddy at the hospital on April 22, 2014, and that Briley did some handiwork for Brooks between April 18 and April 24, 2014. (ECF No. 328, PageID.4834.)

LaCheen then went to work. From late October or early November 2014 through at least November 18, 2014, he tried, without success, to find Player. He interviewed Briley's friend, Steve Brown, and another individual who did not have any alibi testimony to provide. (ECF No. 328, Gov't Ex. 4.) He also interviewed Reddy and Brooks. He had telephone conversations with Swor and also sent him written summaries of his interviews and efforts. (ECF No. 328, Gov't Exs. 3–8.)

During LaCheen's interview with Reddy, she recalled being with Briley at the Copa's Bar and Grill one night. (*Id.* at Gov't Ex. 4.) She thought it was the night

10

before Player ended up in the hospital. (*Id.*) But she also thought this was August 22, 2014—not April 2014. (*Id.*) She told LaCheen that she would look for any photographs she may have taken of Player at the hospital and would search her memory for anyone else who may have seen them at Copa's. (*Id.*) Notably, she did not mention being with Briley at the hospital. (*Id.*)

LaCheen made several unsuccessful attempts to follow up with Reddy and did not hear back from her until November 16, 2014. (*Id.* at Gov't Exs. 5, 8.) She advised that "she tried but came up empty." (*Id.* at Gov't Ex. 8.) LaCheen sent an email to Swor lamenting, "it is becoming increasingly more clear that any support for the hoped-for-alibi defense, if it ever existed at all, has evaporated." (*Id.*) The next day, which was also the start of jury selection, LaCheen received the doctored journal from Brooks. (*Id.* at Gov't Ex. 6.) This was reported to Swor on November 18, 2014. (*Id.*)

Swor testified that he ultimately made the decision not to present an alibi defense. (ECF No. 328, PageID.4837.) He "thought it could be harmful" and "felt it would be disastrous." (*Id.* at PageID.4837–4838.) He worried about losing credibility with the jury by presenting questionable evidence. (*Id.* at PageID.4817, 4832, 4836.) LaCheen likewise testified that he believed a failed alibi was worse than no alibi. (*Id.* at PageID.4878.)

### 2.

It is clear that Swor investigated Briley's alibi defense. Thus, following the evidentiary hearing, Briley narrowed his claim. He now says his "case is not one in which his Defense Trial Counsel failed to conduct an investigation into a potential

11

alibi defense. A late investigation was conducted, but it was inadequate and objectively deficient under the circumstances." (ECF No. 329, PageID.4895.)

Briley focuses on the fact that LaCheen's investigation did not begin until late October, early November. (ECF No. 329, PageID.4901.) And, says Briley, "[w]ith the trial starting on November 16, 2015, the abbreviated investigation of this alibi defense . . . meant there was not the time or ability to do the necessary amount of follow up with Reddy or to find Player." (*Id.*) Not so.

First, LaCheen worked primarily with one of Briley's friends, Steve Brown, to try to find Player. Brown worked the "neighborhood grapevine" and also called people who knew Player. (ECF No. 328, Gov't Exs. 5, 7.) They did not return his calls. Brown believed they did not want to get involved. (*Id.* at Gov't Ex. 8.) Reddy had also lost touch with Player. There is nothing to suggest that, had Swor or LaCheen started the search earlier, they would have found Player.

And even if they had, Player was just one piece of the alibi puzzle. No one disputes that he was hospitalized on April 22, 2014. The more significant issue for the alibi defense was whether it could be established that Briley was with him, or otherwise in Philadelphia, that day or the day before. At Briley's initial meeting with Swor's associates, Briley made no mention of being at the hospital on April 22, 2014. Reddy also made no mention of Briley being with her at the hospital. And she testified that Briley was not with her at the hospital. (*Id.* at PageID.4863.) Briley's daughter testified that she got hospital records from Player and gave them to Swor. (ECF No. 328, PageID.4849–4850; Def. Ex. 1.) It is a reasonable assumption that if Player had

12

corroborating information that Briley was with him, he would have given that to Briley's daughter as well. But he did not.[1]

Next, LaCheen had sufficient time to acquire relevant information from Reddy. He interviewed her on November 9, 2014. True, she believed she was at Copa's with Briley the night before Player was hospitalized, but she thought that was August 2014. LaCheen called her at least four more times to follow-up. (ECF No. 328, Gov't Exs. 5, 8.) She finally called him back on November 16, 2014 to advise him that she came up empty. (*Id.* at Gov't Ex. 8.) This was all reported to Swor.

Swor also chased down the other leads given by Briley. He met with Briley's daughter. Notably, she has no recollection of telling Swor that she ran into her father in Philadelphia on April 21, 2014. And Brooks admitted to LaCheen that she re-created journal entries from entries in her cell phone that were written in a code only she would understand. (*Id.* at Gov't Ex. 6.) Thus, LaCheen asked her to find something else to corroborate that Briley was working at her home on April 21 or April 22, 2014, and she also failed to provide anything. (*Id.* at Gov't Ex. 8.) Again, nothing suggests this would have been different had Swor (through LaCheen) started the investigation earlier.

In sum, Swor did not forego the alibi defense because he lacked or ran out of time to adequately pursue it. His investigation did not turn up anything definitive to

---

[1] Keniysha testified that Player did not understand why Briley was going through this when he had proof Briley was at the hospital seeing him during the relevant time. (ECF No. 328, PageID.4853.) But no explanation is provided as to why Player did not give her or anyone else that "proof," and why he never reached out to Swor.

put Briley in Philadelphia from April 21–22, 2014. As LaCheen testified, none of the witnesses could "produce corroboration of sufficient substance to provide Mr. Briley with the alibi that he was seeking." (ECF No. 328, PageID.4887.) Indeed, Swor received information from Keniysha, Reddy, and Brooks that called Briley's story into question. And while it is true that the investigation ran up against the start of the trial, Swor could have tried to raise a late alibi defense had he turned up sufficient support. *See* Fed. R. Crim. P. 12.1. Instead, he made a strategic decision not to raise it. This is not deficient performance. *Strickland*, 466 U.S. at 690–91; *see also Cope v. United States*, 385 F. App'x 531, 533 (6th Cir. 2010) (finding no deficient performance where evidentiary record showed that trial counsel reasonably investigated alibi defense); *Price v. United States*, No. 15-20472, 2018 U.S. Dist. LEXIS 209925 (E.D. Mich. Dec. 13, 2018) (finding no deficient performance where the record supported the reasonableness of trial counsel's strategic decision not to pursue a non-existent alibi defense after making a reasonable inquiry into the facts); *Crowe v. United States*, No. 11-20481, 2019 U.S. Dist. LEXIS 64743, at *14 (E.D. Mich. Apr. 16, 2019) (finding no deficient performance where trial counsel made strategic decision not to call potential alibi witnesses "whose testimony would have run counter to the weight of the evidence," thereby bringing great risks to the defense).

### 3.

The cases Briley cited do not warrant a different result. They are cases that involved virtually no investigation of an alibi defense. In *Upshaw v. Stephenson*, No. 20-CV-12560, 2022 WL 2754155 (E.D. Mich. July 14, 2022), petitioner told his trial

counsel he was innocent and that three witnesses could provide alibi testimony. But counsel neglected to contact the witnesses or pursue their alibi testimony. *Id.* at \*9. Replacement counsel also failed to undertake any investigation. *Id.* In *Avery v. Prelesnik*, 548 F.3d 434 (6th Cir. 2008), trial counsel never personally attempted to contact the alibi witness. He did so only through an investigator who left it up to the teenage witnesses to contact counsel. *Id.* at 438. And in *United States v. Murillo*, trial counsel "made a conclusory decision not to investigate alibi witnesses because of credibility concerns." No. 07-20417, 2011 U.S. Dist. LEXIS 122541, at \*25 (E.D. Mich. Oct. 24, 2011).

These are not fair comparisons to Swor's efforts to investigate Briley's alibi defense. While "[a] purportedly strategic decision is not objectively reasonable when the attorney has failed to investigate his options and make a reasonable choice between them," *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quotation omitted), that is not what occurred here. Swor weighed the fairly strong evidence linking Briley to the Michigan robberies against the consequences of presenting the weak alibi evidence to the jury. He was aware from his experience that an improperly presented alibi defense can destroy a defendant's credibility. (ECF No. 328, PageID.4817.) This Court "should not second-guess counsel's strategic decisions, and should presume that counsel's conduct is reasonable." *Morris v. Carpenter*, 802 F.3d 825, 843 (6th Cir. 2015).

Thus, absent a showing that Swor's performance was deficient, there is no basis to find ineffective assistance of counsel.

### B.

The lack of prejudice also precludes Briley's motion. To establish prejudice, Briley must demonstrate a "reasonable probability" that the result of his trial would have been different but for Swor's mistake. *Strickland*, 466 U.S. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id*.

Again, even if Swor had presented Briley's alibi defense, it did not credibly establish Briley's presence in Philadelphia. At best, a friend might have testified Briley was visiting him at the hospital (if the friend could have been located), that friend's fiancée would have testified she believed she had dinner with Briley the night before the hospitalization, and the mother of another friend would have testified, based on journal entries she admittedly created in 2015, that Briley was doing renovation work on her home on April 21 and 22, 2014.

Briley believes this would have been sufficient for the jury to reach a different result. He argues that "the prejudice here is not overcome by overwhelming evidence implicating Briley, either." (ECF No. 329, PageID.4902.) But in doing so he significantly downplays that overwhelming evidence. *See Pembrook*, 876 F.3d at 827–28.

Start with the cell phone evidence. The government connected Defendants to certain cell phones that were in contact the day of the robberies, were in the vicinity of the Michigan jewelry stores at the time of the robberies, and traveled from Philadelphia to Michigan and back to Philadelphia. (ECF No. 315, PageID.4719–4720.) One of the phone numbers that the cell-site analysis connected to the other

16

defendants made over 100 calls to Briley's friend, Steven Brown, to Briley's stepmother, to Briley's ex-wife, and to Briley's daughter. (*Id.* at PageID.4720.) This phone left Philadelphia on April 21, 2014, traveled to Milwaukee and to New Buffalo, and made multiple calls in close proximity to Tapper's Jewelry prior to the robbery. (*Id.* at PageID.4732.) In other words, strong evidence was presented to the jury that Briley's cell phone was in Michigan on April 21–22, 2014. Additionally, Defendant Pembrook was shot during the Medawar robbery and left traces of blood that were ultimately connected to him. He did not dispute his involvement in that robbery. Evidence was presented at trial that Pembrook called the phone connected to Briley from his hospital room the day after the robberies.

There was also strong visual evidence placing Briley in Michigan at the time of the robberies. Sue Graff, an employee at the Shell station convenience store in New Buffalo, Michigan, identified Briley from a photo array as one of the customers who was in the store on April 21, 2014. (*Id.* at PageID.4723.) The man Graff identified as Briley was wearing a checkered shirt that was similar to the shirt Briley was wearing in a photograph taken from the cell phone on his person when he was arrested. (*Id.* at PageID.4723–4724.) The jury was also shown the video of the Shell station customers and thus able to make their own assessment as to whether Briley was involved. And the government presented still frame images from the mall where Tapper's Jewelry is located, showing a man who looked like Briley walking outside of the Tapper's store shortly before the robberies and returning to the white Passat. (*Id.*)

17

Against the strength of the incriminating evidence tying Briley to the Michigan robberies, the uncorroborated testimony that he was instead visiting a friend in a Philadelphia hospital on April 22, 2014 does not render the jury's verdict unreliable. So there has been no showing of prejudice either.

## IV.

For these reasons, Briley cannot establish a basis for granting his § 2255 motion. The motion is DENIED.

Nor does the record warrant a certificate of appealability. A court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "That standard is met when 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner,'" *Welch v. United States*, 136 S. Ct. 1257, 1263 (2016) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or when "jurists could conclude the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the same reasons, this showing has not been made. Briley's request for a COA is DENIED.

IT IS SO ORDERED.

Dated: April 12, 2023

                                              s/Laurie J. Michelson
                                              LAURIE J. MICHELSON
                                              UNITED STATES DISTRICT JUDGE